### UNITED STATES of America, Plaintiff–Appellee,

v.

### Leon W. LaBUDDA and Edward J. Mozdzeniak, Defendants–Appellants.

Nos. 88–3428, 89–1018.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1989.

Decided Aug. 14, 1989.

Thomas M. Durkin, Daniel W. Gillogly, and Theodore T. Poulos, Asst. U.S. Attys., Office of the U.S. Atty., Chicago, Ill., for the U.S., plaintiff-appellee.

Richard S. Kling, IIT Chicago–Kent School of Law, Chicago, Ill., for Edward J. Mozdzeniak, defendant-appellant.

Robert A. Loeb, Chicago, Ill., for Leon W. LaBudda, defendant-appellant.

Before POSNER and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Leon W. LaBudda and Edward J. Mozdzeniak, the defendants-appellants, appeal from their convictions for criminal conspiracy. LaBudda and Mozdzeniak were charged under a two-count superseding indictment with the sale of stolen United States Savings Bonds in violation of 18 U.S.C. § 510(b) and with conspiracy to sell stolen United States Savings Bonds in violation of 18 U.S.C. § 371. LaBudda received a bench trial, and Mozdzeniak received a jury trial. At the close of the government's case-in-chief, LaBudda made a motion for judgment of acquittal in which Mozdzeniak orally joined. The district court took the motion under advisement, and the trial continued. The jury found Mozdzeniak guilty on both counts, and the district court reserved its findings as to LaBudda. The district court eventually granted the defendants' motion for judgment of acquittal as to the substantive count, but denied the motion as to the conspiracy count. Thus, with respect to Mozdzeniak, the district court set aside the jury's verdict of guilty on the substantive count and upheld the jury's verdict of guilty on the conspiracy count. The court then found LaBudda not guilty on the substantive count and guilty on the conspiracy count.

LaBudda and Mozdzeniak appeal their convictions for criminal conspiracy. They argue that both the statute and the indictment required the government to prove beyond a reasonable doubt that the United States Savings Bonds were actually stolen. Therefore, because the government failed to make this proof, their criminal convictions cannot stand. For the reasons set forth below, we affirm the judgment of the district court.

## I

In December of 1985, undercover agent William Lueckenhoff of the Federal Bureau of Investigation first met LaBudda. At that time, LaBudda was a broker (a middleman) for the sale of stolen merchandise. As a broker, he represented individuals who possessed stolen goods. His job was to find buyers for the stolen merchandise and to set up sales between the buyers and the individuals he represented.

On March 11, 1986, LaBudda contacted Lueckenhoff about a vehicle he had for sale. Lueckenhoff agreed to call LaBudda the next day at a Shell Service Station that Mozdzeniak owned. Lueckenhoff telephoned LaBudda as planned, and they met later that day. At this meeting, LaBudda mentioned that an unnamed associate of his (Mozdzeniak) had some stolen United States Savings Bonds for sale, worth $20,000–$22,000. He also indicated that some phoney identification, such as a driver's license, would accompany the bonds.

Two days later, Lueckenhoff and LaBudda met at Mozdzeniak's gas station to discuss a possible sale of the bonds. At this meeting, LaBudda handed Lueckenhoff a $1,000 United States Savings Bond, payable to Frank Klikowski, as a sample of the bonds that were for sale. LaBudda told Lueckenhoff that his associate had $50,000 worth of bonds and that these bonds were not listed as stolen. Although Lueckenhoff showed an interest in buying the bonds, he and LaBudda could not reach an agreement. LaBudda's associate, who did not want to be directly involved in the negotiations, insisted on selling the bonds for half their value. Because of budgetary constraints with the Secret Service, however, Lueckenhoff could only offer to pay 20%–25% of their value. Since they could not reach an accord, LaBudda and Lueckenhoff eventually discontinued their negotiations.

Approximately one year later, on March 19, 1987, Lueckenhoff contacted LaBudda and informed him that he wanted to purchase the bonds if they were still available.

Lueckenhoff indicated that he was now willing to pay whatever price LaBudda's associate wanted for the bonds. After checking with his associate, LaBudda told Lueckenhoff that the bonds were still available. A few days later, Lueckenhoff telephoned LaBudda and told him he would soon be in Chicago and wanted to buy the bonds at that time. LaBudda said he would contact his associate to see if the sale could be made then. During this conversation, LaBudda told Lueckenhoff that Lueckenhoff had previously met LaBudda at his associate's place of business, which recently closed down. Lueckenhoff understood this statement to refer to Mozdzeniak's gas station.

On March 25, 1987, Lueckenhoff telephoned LaBudda in order to fix the time and place of the transaction. Lueckenhoff told LaBudda that he was bringing along someone else to check the authenticity of the bonds. LaBudda stated that he would check with his associate and then get back in touch with Lueckenhoff. Although LaBudda was not able to contact his associate, he did agree to meet Lueckenhoff that evening at 7:30 p.m. at a bar which was across the street from the gas station that Mozdzeniak had owned.

Since a meeting was set for the sale of the bonds, two Secret Service surveillance agents were dispatched to the bar. Shortly after the agents arrived, LaBudda entered the bar and made a telephone call from the bar's pay phone. As planned, Lueckenhoff arrived at the bar around 7:30 p.m. He brought Secret Service Agent Gerald J. Rooney with him. LaBudda, who did not recognize the two Secret Service surveillance agents as having been in the bar before, wanted to move their meeting to a restaurant. The parties agreed to wait for LaBudda's associate at the bar before leaving for the restaurant.

Shortly thereafter, Mozdzeniak entered the bar and immediately joined LaBudda, Lueckenhoff, and Rooney. After a brief discussion, they all left the bar for the restaurant. At the restaurant, Lueckenhoff suggested conducting the transaction at the Midway airport. Mozdzeniak, however, rejected this proposal because there were too many police officers at the airport. They eventually agreed to exchange the cash and bonds at a vacant parking lot. After the parties had agreed to the mechanics of the exchange, Mozdzeniak informed Lueckenhoff that he currently had only $26,000 worth of bonds for sale. But he immediately assured Lueckenhoff that he would have an additional $35,000 worth of bonds for sale at a later date. Lueckenhoff then asked for, and received, a sample bond so that Rooney could purportedly check the authenticity of it. The parties then left the restaurant in order to meet at the parking lot.

Mozdzeniak did not immediately show up at the parking lot because he was nervous about the presence of Rooney. LaBudda, however, had the bonds and was ready to conduct the transaction. LaBudda handed Rooney nine United States Savings Bonds, made payable to Frank Klikowski. After Rooney examined the bonds, Lueckenhoff directed him to give the bonds back to LaBudda and to go to his car and get the cash. When Rooney left, Lueckenhoff placed LaBudda under arrest. Mozdzeniak was arrested shortly thereafter when he arrived at the parking lot.

On February 11, 1988, a grand jury charged LaBudda and Mozdzeniak in a two-count superseding indictment. Count 1 charged them with conspiracy to sell stolen United States Savings Bonds in violation of 18 U.S.C. § 371.[1] Count 2 charged them with the substantive offense of selling stolen United States Savings Bonds in violation of 18 U.S.C. § 510(b).[2] Mozdzeniak

1. 18 U.S.C. § 371 provides in pertinent part:
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 510(b) provides:
 Whoever, with knowledge that such Treasury check or bond or security of the United States is stolen or bears a falsely made or forged endorsement or signature buys, sells, exchanges,

received a jury trial, and LaBudda received a bench trial. At the end of the government's case-in-chief, LaBudda moved for judgment of acquittal, and Mozdzeniak orally joined in that motion. The district court took the motion under advisement, and the trial continued. The jury found Mozdzeniak guilty on both counts, and the district court reserved its findings as to LaBudda.

On September 9, 1988, the district court granted the motion for judgment of acquittal as to the substantive count, but not the conspiracy count, on the ground that the government failed to prove beyond a reasonable doubt that the United States Savings Bonds were actually stolen. Therefore, the court set aside the jury's verdict of guilty against Mozdzeniak on the substantive count. The district court then found LaBudda guilty of conspiracy and not guilty of the substantive offense. The district court placed LaBudda on probation for five years and sentenced Mozdzeniak to one year and one day imprisonment.

## II

LaBudda and Mozdzeniak argue that the government failed to prove beyond a reasonable doubt that they conspired to sell stolen United States Savings Bonds. They premise their claim on two related arguments. First, they note that the district court granted their motion for judgment of acquittal on the substantive count because the government failed to prove that the bonds were actually stolen as required by § 510(b). Therefore, they contend that in order to convict them for conspiracy to sell stolen bonds, the government similarly had to prove that the bonds were actually stolen. Second, they claim that even if the government did not have to prove that the bonds were stolen, the government alleges in the indictment that the bonds were in fact stolen. Thus, they argue that the government, by failing to prove that the bonds were actually stolen, did not prove

the conspiracy alleged in the indictment. We will discuss each argument in turn.

### A

In order to convict a defendant of selling stolen United States Savings Bonds under § 510(b), the government must prove that the defendant believed the bonds were stolen and that the bonds in fact were stolen. *See* 18 U.S.C. § 510(b). As the appellants correctly note, the district court acquitted them of selling stolen bonds (the substantive offense) because the government failed to prove beyond a reasonable doubt that the bonds were actually stolen. Acquittal of a substantive offense, however, does not necessarily bar a conviction for conspiring to commit that substantive offense, *e.g.*, *United States v. Soteras*, 770 F.2d 641, 646 (7th Cir.1985); *United States v. Dalzotto*, 603 F.2d 642, 646 (7th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979), because commission of a substantive offense and a conspiracy to commit that substantive offense are separate and distinct crimes, *e.g.*, *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946); *Soteras*, 770 F.2d at 646; *United States v. Green*, 735 F.2d 1018, 1028 (7th Cir.1984). The issue, then, is whether the government must also prove that the bonds were actually stolen in order to convict LaBudda and Mozdzeniak for conspiring to violate § 510(b).

Although this issue before us appears to be a novel one in the context of § 510(b), other courts have faced similar issues under other statutes. For example, in *United States v. Shively*, 715 F.2d 260 (7th Cir. 1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984), the government charged the defendants in part with violating 18 U.S.C. § 1014, which makes it unlawful to make a false statement to a federally insured bank, and with conspiring to violate § 1014. Our court held that because the government did not prove that the bank was federally insured at the time the defendants made false statements to it,

receives, delivers, retains, or conceals any such Treasury check or bond or security of the United States that in fact is stolen or bears a forged

or falsely made endorsement or signature shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

they could not be convicted of violating § 1014. Our court further held, however, that the government had proved a conspiracy to violate § 1014. The *Shively* court reasoned that under the law of conspiracy, it is "enough if the defendants intend to defraud a federally insured bank, even though, unbeknownst to them, the bank has lost its insurance." *Id.* at 267.

Additionally, in *United States v. Petit*, 841 F.2d 1546 (11th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988), government agents set up a sting operation and sold the defendants electronic equipment. The government had borrowed the electronic equipment for this sting operation from a carrier that was shipping the goods to Miami. After being convicted for conspiring to receive stolen goods in violation of 18 U.S.C. § 659, the defendants appealed, arguing that their conspiracy convictions could not stand because the goods were not in fact stolen. The Eleventh Circuit rejected this argument. The *Petit* court reasoned that because the law of conspiracy focuses primarily on the intent of the conspirators, the government did not have to prove that the goods were actually stolen; rather, the government needed only to prove that the defendants *believed* that the goods were stolen. *Id.* at 1550.

Many other courts have similarly ruled that in a charge of conspiracy, it is the intent of the defendants to violate the law which matters, not whether their conduct would actually violate the underlying substantive statute. *See, e.g., United States v. Sarro*, 742 F.2d 1286, 1297 (11th Cir. 1984) (holding that the defendants were properly convicted of conspiring to transport stolen paintings even though the government did not prove that the paintings were actually stolen); *United States v. Harris*, 729 F.2d 441, 447 (7th Cir.1984) (stating that if conspirators intended to embezzle over $100 worth of tile, then a conspiracy existed to commit a felony even though the conspirators may have committed only a misdemeanor by taking less than $100 worth of tile); *United States v. Rose*, 590 F.2d 232, 235 (7th Cir.1978) (rejecting the defendants' argument that they could

not be guilty of conspiring to transport stolen goods because the goods had not actually been stolen), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979). Thus, because the law of conspiracy rests on the belief that the *agreement* to engage in unlawful conduct, by itself, is a sufficient threat to society to justify criminal sanctions, *see United States v. Feola*, 420 U.S. 671, 694, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975), defendants can be found guilty of criminal conspiracy even though the object of their conspiracy is unattainable from the very beginning, *see, e.g., Shively*, 715 F.2d at 266; *United States v. Giordano*, 693 F.2d 245, 249 (2d Cir.1982).

 The sound reasoning of these cases leads us to hold that the government did not have to prove that the United States Savings Bonds were in fact stolen in order to convict LaBudda and Mozdzeniak of conspiring to violate § 510(b). Rather, the government needed only to prove beyond a reasonable doubt that LaBudda and Mozdzeniak believed the bonds were stolen. After reviewing the record in the light most favorable to the government, *see United States v. Spivey*, 859 F.2d 461, 464 (7th Cir.1988), we find that the government presented sufficient evidence to prove that LaBudda and Mozdzeniak believed the bonds to be stolen.

First, we note that in his conversations with Lueckenhoff, LaBudda indicated his personal belief that the bonds were stolen. For instance, when Lueckenhoff asked LaBudda if the bonds were stolen, LaBudda responded, "Yea, but they're not on the sheet." Tr. at 155. Second, the fact that LaBudda and Mozdzeniak were selling the bonds for only half their value is indicative of their belief that the bonds were stolen. *See United States v. Livingston*, 816 F.2d 184, 193 (5th Cir.1987); *see also United States v. Martin*, 690 F.2d 416, 421 (4th Cir.1982) (selling goods for less than their value supports the conclusion that the goods were stolen); *United States v. Luman*, 624 F.2d 152, 154 (10th Cir.1980) (same). Furthermore, the circumstances under which LaBudda and Mozdzeniak set

up the transaction leads us to conclude that they believed the bonds were stolen. For example, Mozdzeniak did not want to sell the bonds at the airport because there were too many police officers at that location. *See* Tr. at 212. Instead, he wanted to consummate the deal at a vacant parking lot. Additionally, Mozdzeniak stated that he did not want to handle the bonds. *See id.* at 225. Finally, the fact that both La-Budda and Mozdzeniak were suspicious of individuals that they had not seen before indicates that they believed the bonds to be stolen. *See id.* at 195–96, 245–46.

Although LaBudda and Mozdzeniak could not be convicted of violating § 510(b) because the government failed to prove that the bonds were actually stolen, this provides no basis for us to reverse their conspiracy convictions. The government presented more than ample evidence to show that LaBudda and Mozdzeniak believed the bonds were stolen. Therefore, they were properly convicted of conspiring to violate § 510(b).

**B**

The appellants also claim that we should reverse their conspiracy convictions because the government failed to prove the conspiracy alleged in the indictment. They note that in the conspiracy count of the indictment, the government alleges at various places that the bonds were stolen. Thus, LaBudda and Mozdzeniak argue that the government had to prove the bonds were actually stolen because that is what the government alleges as part of the conspiracy in the indictment.

This argument is without merit. On prior occasions, our court has rejected this same argument. For example, in *United States v. Greene*, 497 F.2d 1068 (7th Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975), a jury convicted the defendant of air piracy, which is a general intent crime. On appeal, however, the defendant argued that the government had to prove a specific intent to violate the law because the indictment contained the words "knowingly" and "willingly" in describing the defendant's conduct. In re-

jecting this argument, the *Greene* court held that language contained in an indictment that goes beyond alleging the elements of the offense is mere surplusage, and the government does not have to prove this surplusage at trial. *Id.* at 1086; *see also United States v. Liparota*, 735 F.2d 1044, 1048 (7th Cir.1984) ("[A]llegations in an indictment not essential to prove the crime charged are mere surplusage. Such allegations need not be proved nor embodied in instructions to the jury." (citations omitted)), *rev'd on other grounds*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).

Other circuits follow this same rule. In *United States v. Jenkins*, 785 F.2d 1387, 1392 (9th Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 192, 93 L.Ed.2d 125 (1986), the defendants were tried in part for making false statements to obtain loans insured by the government in violation of 18 U.S.C. § 1010. Under § 1010, the government does not have to prove that the lender was in fact federally insured in order to convict a defendant for violating this statute. In that case, however, the defendants argued that because the indictment alleged that the lender was federally insured, the government had to prove this allegation at trial. The Ninth Circuit rejected this argument. It held that the government did not have to prove all facts alleged in an indictment. Rather, the government had to prove only enough facts showing the essential elements of the crime charged. Excess allegations are mere surplusage, which did not have to be proved at trial. *Id.* at 1392; *see also United States v. Pumphrey*, 831 F.2d 307, 309 (D.C.Cir.1987) ("[E]xcess allegations in an indictment that do not change the basic nature of the offense charged need not be proven and should be treated as mere surplusage."); *United States v. Brown*, 604 F.2d 557, 560 (8th Cir.1979) ("Allegations not essential to prove the crime for which the defendant is charged are mere surplusage and need not be proved or embodied in the instructions to the jury."); *United States v. Harper*, 579 F.2d 1235, 1239 (10th Cir.) ("When the language of the indictment goes beyond alleging the elements of the offense, it is mere surplusage and such surplusage need not

be proved."), *cert. denied,* 439 U.S. 968, 99 S.Ct. 459, 58 L.Ed.2d 427 (1978).

As we have already held, the government needed to prove only that La-Budda and Mozdzeniak believed the United States Savings Bonds were stolen in order to convict them for conspiring to violate § 510(b). Therefore, any language in the conspiracy count of the indictment stating that the bonds were in fact stolen is mere surplusage, which the government did not need to prove at trial.

### III

For all the foregoing reasons, the judgment of the district court is AFFIRMED.